IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
NO: 3:04CR191

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> Plaintiff ) <br> ) <br> vs. ) <br> ) <br> BRIAN KEITH BURROUGH, ) <br> Defendant. ) <br> ) <br> _____ ) | MEMORANDUM AND <u>RECOMMENDATION</u> |

**THIS MATTER IS BEFORE THE COURT** on the "Motion to Suppress Statement of Defendant; Request for Evidentiary Hearing" ("Motion to Suppress") (Document No. 68), filed February 28, 2004 by Brian Keith Burrough, and the "United States' Response to Motion to Suppress Evidence" (Document No. 74), filed March 14, 2005 by the United States. An evidentiary hearing was conducted before the undersigned on March 18, 2005, and the Motion to Suppress is now ripe for disposition.

## I. PROCEDURAL AND FACTUAL BACKGROUND

As noted above, Mr. Burrough filed the Motion to Suppress on February 28, 2005. In the Motion to Suppress, Mr. Burrough contends that the statements he made on January 22, 2004 to certain law enforcement officers were obtained in violation of his <u>Miranda</u> rights and were involuntary. The Court held an evidentiary hearing on the Motion to Suppress on March 18, 2005. Based upon the evidence presented at the March 18 hearing, the undersigned makes the following findings of fact.

On January 22, 2004, Kathleen Flynn, who was then a Detective in the Homicide Division

1



of the Charlotte-Mecklenburg Police Department (the "Police Department"), spoke to Ken Clark, a Sergeant in the Robbery Division of the Police Department. Detective Flynn, who had served in the Homicide Division for almost five years and had been involved in numerous homicide investigations, was actively investigating a murder that occurred on Spring Street (the "Spring Street Murder") in October 2003. Sergeant Clark told Detective Flynn that Mr. Burroughs had been arrested on robbery charges and that he may have information related to the Spring Street Murder.

That day, at approximately 10:30 A.M., Valerie Gordon, also a Detective with the Police Department, and Detective Flynn went to the Mecklenburg County Jail (the "Jail"). Detective Flynn and Detective Gordon signed in as visitors and were escorted to a visitor contact room. Mr. Burrough was brought into the room. Detective Flynn introduced herself and Detective Gordon and explained to Mr. Burrough that they were from the Homicide Division of the Police Department. Detective Flynn then asked Mr. Burrough if he had any information on the Spring Street Murder.

In response, Mr. Burrough asked if either Detective Flynn or Detective Gordon were federal agents. He stated that he had information on the Spring Street Murder, but before he spoke to anyone, he wanted to see some federal "tin." "Tin" is street lingo for a law enforcement badge. Detective Flynn told Mr. Burrough that she could arrange for him to meet with a federal agent. At that point, Detective Flynn and Detective Gordon left the Jail.

After leaving the Jail, Detective Flynn called Jimmy Messer, a Detective with the Police Department assigned to the multi-agency Violent Crime Task Force. As of the date of the hearing, Detective Messer had served on the Violent Crime Task Force for approximately seven years. On January 22, 2004, Detective Messer was also actively involved in the investigation of the Spring Street Murder. Detective Gordon knew that Detective Messer worked with David Booth, a senior

Special Agent with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives. During Detective Flynn's conversation with Detective Messer, Detective Flynn told Detective Messer that Mr. Burrough wanted to see federal credentials and that she knew Detective Messer worked with Special Agent Booth.

After Detective Messer finished talking to Detective Flynn, Detective Messer called Special Agent Booth. Special Agent Booth, who, at the time of the hearing, had served as a Special Agent for approximately fifteen years, was also actively investigating the Spring Street Murder. Special Agent Booth understood that Detective Messer called him both because Special Agent Booth was involved in the investigation and because the individual with information wanted to speak to a federal agent.

Later that day, Detective Flynn, Detective Messer and Special Agent Booth went to the Jail and were escorted to a visitor contact room. Detective Messer and Special Agent Booth were dressed casually. The room was large enough for a table and chairs. Mr. Burrough was brought into the room. Detective Flynn introduced herself (again), Detective Messer and Special Agent Booth to Mr. Burrough. Special Agent Booth showed his federal badge to Mr. Burrough and identified himself as a special agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives. Detective Messer showed his Police Department badge to Mr. Burrough.

Detective Messer then advised Mr. Burrough of his rights. As part of that process, Detective Messer used a form entitled "Adult Waiver of Rights" (the "Waiver Form"). Detective Messer filled out the top part of the Waiver Form with Mr. Burrough's age, birth date and address. Detective Messer read the first right – the right to remain silent – listed on the Waiver Form to Mr. Burrough. Mr. Burrough then wrote "BB," his initials, on the blank beside the first right, indicating that he

understood that right. Detective Messer asked Mr. Burrough to read the second right. Mr. Burrough read the second right and again wrote his initials on the blank beside the right. Detective Messer then read the third and fourth rights, after which Mr. Burrough wrote his initials on the blanks beside those rights. Detective Flynn and Special Agent Booth listened to Detective Messer's review of the rights and watched Mr. Burrough write his initials next to each right.

Mr. Burrough then indicated that he wanted to waive his rights and speak to Detective Messer, Detective Flynn and Special Agent Booth. Mr. Burrough signed his name in the blank at the bottom of the Waiver Form, above which the Waiver Form reads "I now state that I DO wish to answer questions at this time. My decision to answer questions now is made freely and is my own choice...." Detective Flynn and Special Agent Booth heard Mr. Burrough indicate that he wanted to waive his rights and watched him sign his name in the blank at the bottom of the Waiver Form. Detective Flynn then signed the Waiver Form as a witness.

Immediately after Mr. Burrough signed the Waiver Form, Mr. Burrough related to Detective Flynn, Detective Messer and Special Agent Booth certain information related to the Spring Street Murder. Mr. Burrough was very animated and stated something to the effect of, "I'm your mother-fucking gunman." Detective Messer asked Mr. Burrough to calm down. Mr. Burrough made further statements in which he adamantly told Detective Flynn, Detective Messer and Special Agent Booth that he shot and killed Jammie Covington, the victim of the Spring Street Murder. Mr. Burrough also provided information related to the Spring Street Murder. Because of Detective Messer and Special Agent Booth's continued investigation of certain drug conspiracies, and the connection of those conspiracies to the Spring Street Murder, Detective Messer and Special Agent Booth were interested in the details around the Spring Street Murder.

Detective Messer may have told Mr. Burrough that Mr. Burrough needed to "get on the bus." By that statement, Detective Messer meant that Mr. Burrough should be truthful and forthright. Mr. Burrough understood that statement to mean that it would be in his best interest to be the first individual in the case to cooperate with law enforcement. Detective Flynn, Detective Messer and Special Agent Booth observed that Mr. Burrough was coherent. Detective Flynn never worried that Mr. Burrough felt coerced or intimidated into speaking to her, Detective Messer and Special Agent Booth. Similarly, Detective Messer and Special Agent Booth stated that Mr. Burrough was never threatened, tricked or coerced.

After approximately an hour and a half, Detective Messer asked Mr. Burrough if he would mind moving to the Police Department. Detective Messer represented to Mr. Burrough that he would be fed at the Police Department and interviewed further. Detective Messer, Detective Flynn, Special Agent Booth and Mr. Burrough subsequently exited the Jail. At approximately 6 P.M., Detective Messer, Detective Flynn and Special Agent Booth resumed the interview of Mr. Burrough in a room at the Police Department.

After January 22, 2004, Mr. Burrough continued to initiate telephone contact with Detective Messer – despite Detective Messer's direction that Mr. Burrough should go through his attorneys.

On February 22, 2005, over a year later, Detective Flynn prepared a draft report setting forth the events of January 22, 2004 (the "Draft Report"). In preparing the Draft Report, Detective Flynn relied upon her handwritten notes and the case file. Detective Flynn sent the Draft Report to Christopher Kimbell, an officer with the Police Department, for his review.

On March 4, 2005, Detective Flynn entered a final report setting forth the events of January 22, 2004 (the "Final Report") into KBCOPS, an electronic system which maintains certain

paperwork of the Police Department.

Mr. Burrough had been arrested approximately six or seven times prior to his arrest in this case. He also has a prior conviction for voluntary manslaughter. Mr. Burrough admits that – on each occasion – he was advised of his rights on each occasion and nonetheless chose to speak with law enforcement authorities. In Mr. Burrough's words, he signed the Waiver Form "every time." With respect to the events of January 22, 2004, Mr. Burrough concedes that – with the possible exception of the "get on the bus" comment – he was not threatened. Mr. Burrough claims he requested to speak to a lawyer when he initially encountered Detective Flynn and Detective Gordon at the Jail.

## II. LEGAL ANALYSIS AND CONCLUSIONS

### A. Whether Mr. Burrough's Statements Were Made in Violation of Miranda

The Supreme Court recently summarized the "concrete constitutional guidelines" laid down in Miranda v. Arizona, 384 U.S. 436 (1966), as follows:

> Those guidelines established that the admissibility in evidence of any statement given during custodial interrogation of a suspect would depend on whether the police provided the suspect with four warnings. These warnings (which have come to be known colloquially as "Miranda rights") are: a suspect "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney; that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."

Dickerson v. United States, 530 U.S. 428, 435 (2000) (quoting Miranda, 384 U.S. at 479) (marks in original). In other words, unless a suspect is read his Miranda rights prior to being interrogated, and knowingly and intelligently waives those rights, any statement made by that suspect will be inadmissible in evidence. See id; Moran v. Burbine, 475 U.S. 412, 421 (1986). Moreover, once the right to counsel is asserted, a suspect in custody may not be questioned outside the presence of his attorney "unless the accused himself initiates further communication, exchanges, or conversations

with the police." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). In the Motion to Suppress, Mr. Burrough contends that his January 22, 2004 statements to Detective Flynn, Detective Messer and Special Agent Booth were made in violation of <u>Miranda</u> because he had invoked his right to counsel during his meeting with Detective Flynn and Detective Gordon and because he did not knowingly and intelligently waive those rights.

With respect to whether Mr. Burrough invoked his right to counsel, Detective Flynn – whom the undersigned finds to be credible – testified that Mr. Burrough never asked for a lawyer. The testimony of Detective Messer and Special Agent Booth regarding their conversations with Detective Flynn, and the fact that Special Agent Booth showed Mr. Burrough his federal badge when first introduced to Mr. Burrough, support Detective Flynn's version of the events that occurred during Mr. Burrough's meeting with Detective Flynn and Detective Gordon. In light of Mr. Burrough's history – that is, the repeated occasions on which Mr. Burrough was read his rights and then chose to waive those rights and speak to law enforcement authorities – the undersigned does not find credible Mr. Burrough's testimony that, when he met with Detective Flynn and Detective Gordon, he told them he would not speak without his lawyer present. As such, the undersigned concludes that Mr. Burrough did not invoke his right to counsel – and thus that Detective Flynn, Detective Messer and Special Agent Booth were free to initiate contact with Mr. Burrough.

With respect to whether Mr. Burrough knowingly and intelligently waived his <u>Miranda</u> rights, Detective Flynn, Detective Messer and Special Agent Booth testified that Detective Messer read Mr. Burrough his rights; that, in doing so, Detective Messer used the Waiver Form; that Mr. Burrough wrote his initials indicating that he understood each of those rights; that Mr. Burrough indicated he wanted to waive his <u>Miranda</u> rights and speak to them; that Mr. Burrough signed his

name on the blank at the bottom of the Waiver Form; and that Mr. Burrough never asked for an attorney. The Court's review of the Waiver Form confirms that it comports with Miranda. Detective Flynn, Detective Messer and Special Agent Booth further testified that, after Mr. Burrough indicated he wanted to waive his Miranda rights, Mr. Burrough spoke to Detective Flynn, Detective Messer and Special Agent Booth and responded to their questions; that Mr. Burrough was coherent; and that he was never threatened or coerced.

Based upon the foregoing and considering the totality of the circumstances surrounding the interrogation, the undersigned concludes that Mr. Burrough knowingly and intelligently waived his Miranda rights. Nothing in the record indicates that Mr. Burrough was coerced into waiving his rights or that Mr. Burrough was incapable of giving a knowing and intelligent waiver.

### B. Whether Mr. Burrough's Statements Were Voluntary

The Supreme Court made clear in Dickerson that "[t]he requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry" under the Due Process Clause. Dickerson, 530 U.S. at 444; see also United States v. Braxton, 112 F.3d 777, 780 (4th Cir. 1997) (en banc) ("[A] statement is involuntary under the Fifth Amendment only if it is involuntary within the meaning of the Due Process Clause."). Unlike the test for a knowing and intelligent waiver of Miranda rights, however, the Fourteenth Amendment voluntariness test requires a determination whether "the defendant's will has been overborne or his capacity for self-determination critically impaired because of coercive police conduct." Cristobal, 293 F.3d at 140 (internal marks and citations omitted; emphasis added.) Appropriately cognizant of the dual-pronged inquiry, Mr. Burrough contends generally in the Motion to Suppress that his January 22, 2004 statements to Detective Flynn, Detective Messer and Agent Booth were involuntary.

On this issue, Detective Flynn, Detective Messer and Special Agent Booth testified that they never threatened or tricked Mr. Burrough and that Mr. Burrough never asked for an attorney. There is nothing in the record to suggest that Mr. Burrough was harmed or threatened with harm if he did not answer the questions posed by Detective Flynn, Detective Messer and Special Agent Booth; that Mr. Burrough was deprived of anything; that he was subject to a lengthy period of interrogation or isolation; or that he was deceived. See United States v. Elie, 111 F.3d 1135, 1143 (4th Cir. 1997) (noting instances of egregious government conduct as a result of which a defendant's will has been found to be overborne), abrogated on other grounds by, United States v. Sterling, 283 F.2d 216, (4th Cir. 2002); Cristobal, 293 F.3d at 140 (same). Furthermore, even if Detective Messer told Mr. Burrough that Mr. Burrough should "get on the bus," meaning that Mr. Burrough should cooperate with the investigation, that statement is entirely permissible and does not render subsequent statements by Mr. Lewis involuntary. See United States v. Shears, 762 F.2d 397, 401-02 (4th Cir. 1985) ("[T]he cases indicate that government agents may validly make some representations to a defendant or may discuss cooperation without rendering the resulting confession involuntary.").

In short, there is no basis upon which the Court could "find the kind of coercive police conduct that is necessary to render [a] statement involuntary under the Due Process Clause." Elie, 111 F.3d at 1143. Accordingly, after considering the totality of the circumstances under which Mr. Burrough's statements were made, see Elie, 111 F.3d at 1143, the undersigned concludes that Mr. Burrough's statements were voluntary within the meaning of the Due Process Clause of the Fourteenth Amendment.

## IV. RECOMMENDATIONS

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that the

"Motion to Suppress Statement of Defendant; Request for Evidentiary Hearing" (Document No.68) be **DENIED**.

## V. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this memorandum must be filed within ten (10) days after service of same. Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rice, 741 F. Supp. 101, 102 (W.D. N.C. 1990). Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to de novo review by the district court, Snyder, 889 F.2d at 1365, and may preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties and the Honorable Graham C. Mullen.

IT IS SO RECOMMENDED, this 23rd day of March, 2005.

DAVID C. KEESLER
UNITED STATES MAGISTRATE JUDGE

bsw

United States District Court
for the
Western District of North Carolina
March 23, 2005

* * MAILING CERTIFICATE OF CLERK * *

Re:  3:04-cr-00191

True and correct copies of the attached were mailed by the clerk to the following:

    Karen S. Marston, Esq.
    U.S. Attorney's Office
    227 W. Trade St.
    1700 Cariilon Bldg.
    Charlotte, NC  28202

    Robert K. Trobich, Esq.
    301 S. McDowell St.
    Suite 412
    Charlotte, NC  28204

    Mark P. Foster Jr., Esq.
    Nixon, Park & Gronquist, Foster, PLLC
    101 N. McDowell
    Suite 126
    Charlotte, NC  28204

cc:
Judge                      (X)
Magistrate Judge      ( )
U.S. Marshal          ( )
Probation             ( )
U.S. Attorney         ( )
Atty. for Deft.       ( )
Defendant             ( )
Warden                ( )
Bureau of Prisons     ( )
Court Reporter        ( )
Courtroom Deputy      ( )
Orig-Security         ( )
Bankruptcy Clerk's Ofc. ( )
Other_____   ( )

Date: 3-23-05

Frank G. Johns, Clerk
By: _____
    Deputy Clerk